## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNIVERSAL CONTRACTING, LLC, a Utah limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>UTAH DEPARTMENT OF COMMERCE; FRANCINE GIANI, Executive Director of the Utah Department of Commerce; DIVISION OF OCCUPATIONAL & PROFESSIONAL LICENSING; and MARK SHURTLEFF, Attorney General of the State of Utah, in his official capacity,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:12-cv-00910-RJS<br><br>Judge Robert J. Shelby |

Plaintiff Universal Contracting, LLC moves the court to grant summary judgment in its favor and declare preempted by federal law certain immigration-related amendments to Utah's Construction Trades Licensing Act, Utah Code Section 58-55-101, *et seq.* Those amendments make it unlawful for an unincorporated entity like the Plaintiff to have owners engaged in the construction trade in Utah while not lawfully present in the United States and for such an entity to provide its owners as laborers to others. Criminal and civil penalties are triggered when an unincorporated entity engages in this conduct. Plaintiff argues that these amendments are preempted by the federal Immigration Reform and Control Act of 1986 (IRCA), under that law's express preemption provision, and because IRCA provisions conflict with the amendments.

Plaintiff stakes its case on this preemption claim. Although Plaintiff asserts in its Complaint additional causes of action for Due Process and Substantive Due Process violations (Dkt. 2 at 15-8), its counsel stipulated at oral argument on August 13, 2104 to withdraw those

other causes of action and also agreed that if the court denied its Motion, judgment in favor of Defendants would be appropriate.

Having carefully considered the parties' briefing, the evidence submitted, and the arguments of counsel, the court concludes that Plaintiff has failed to show that the amendments to Utah's Construction Trades Licensing Act are preempted by federal immigration law. Accordingly, the court DENIES Plaintiff's Motion for Summary Judgment and Declaratory Judgment. (Dkt. 43.) Pursuant to Plaintiff's stipulation, the court GRANTS judgment in Defendants' favor on Plaintiff's Preemption Cause of Action, DISMISSES Plaintiff's other causes of action, and DISMISSES this case.

## BACKGROUND

### I.     The Parties

Plaintiff is a Utah limited liability company based in American Fork, Utah County. (Atkinson Aff. at ¶ 3, Exh. B to Dkt. 44.) It has a unique business model. It is comprised of more than 900 members who work in Utah's construction trade. *Id.* at ¶ 4. Each member is also a company owner and holds an equity position with the company, enjoying various ownership rights and receiving annually an IRS Form K-1 from the company for tax purposes. *Id.* at ¶ 6. Member-owners are not Plaintiff's employees. *Id.* at ¶¶ 12, 26. They are responsible for finding their own construction jobs, determining which jobs they will accept, negotiating their pay, and deciding their work schedule. *Id.* at ¶ 11. Plaintiff provides administrative services for its member-owners such as payroll, bookkeeping, and contract management. It also maintains workers compensation insurance, pays unemployment insurance premiums, and holds commercial general liability insurance for all member-owners who engage in construction work. *Id.* at ¶¶ 16-18.

Plaintiff's Managing Member, Cory Atkinson, explains that Plaintiff is not in the "employee leasing or labor staffing business."  (Second Atkinson Aff. at ¶ 5, Dkt. 45-1.)

> [Plaintiff] is engaged in the business of providing specialized construction related services on construction projects to independent contractors entirely and exclusively through individuals who comprise the members of that limited liability company.  These services are furnished in much the same way as legal services by partners in a law firm or certified public accountants in an accounting firm.  No such work or services are or were performed by any employees of any defendant limited liability company.

*Id.*  Plaintiff does not bid on construction projects.  *Id.* at ¶ 6.  "Rather, through [its] members it simply offers a contingent pool of independent tradesmen from which contractors who have successfully bid on such projects may draw to increase production on any given job as the need arises."  *Id.*

The vast majority of Plaintiff's member-owners are Latino, including many who were born in countries other than the United States.  Atkinson Aff. at ¶ 25.  Plaintiff requires its member-owners to complete Forms I-9 and to provide documentation supporting their authorization to work in the United States.  *Id.* at ¶ 26.  Plaintiff keeps on file the completed Forms I-9 and copies of the supporting documents.  *Id.*  Plaintiff also requires its member-owners to sign an Operating Agreement providing that membership is conditioned on the signer being either a United States citizen, permanent resident, or otherwise authorized to lawfully work in the United States and be paid for such work under the Immigration and Naturalization Act, U.S.C. § 1101, *et seq.*  *Id.* at ¶¶ 28.  If Plaintiff determines that the member-owner does not meet at least one of those conditions, it disassociates that member-owner and redeems the member-owner's ownership rights.  *Id.* at ¶ 29.  Plaintiff does not use the federal government's online "E-Verify" system to check the work authorization status of its member-owners.  *Id.* at ¶ 27.  Plaintiff refrains from doing so because its member-owners are not employees, and E-Verify is

purportedly reserved for employers who wish to check employees' work authorization or for those who wish to "self-check" their own authorization.

Plaintiff has two managers: 1) Grove Creek, LLC, an entity which provides contracting and all administrative functions for Plaintiff; and 2) Ren Bell, a person who oversees Plaintiff's safety and quality programs. *Id.* at ¶¶ 7-13. Bell is not a member of Plaintiff's company. *Id.* at ¶ 12. He is Plaintiff's lone W-2 employee. *Id.* Bell also holds a Utah contractor's license and acts as a "qualifier" for Plaintiff. *Id.* at ¶ 13. This means that he is the person through whom Plaintiff qualifies for a contractor's license. *Id.* Plaintiff holds a contractor's license issued by Defendant Division of Occupational and Professional Licensing (DOPL). *Id.* at ¶ 14.

DOPL is a division within Co-Defendant Utah Department of Commerce, an executive branch agency of the State of Utah charged with licensing and regulating Utah's professional and business community. Defendant Francine Giani is the Executive Director of the Department of Commerce.

## II.    2011 Amendments to Utah's Construction Trade Licensing Act

The Utah Legislature in its 2011 general session enacted Senate Bill 35 (S.B. 35), entitled "Construction Licensees Related Amendments." S.B. 35 was subsequently signed into law. Sections 10, 11, and 12 of S.B. 35 include immigration-related provisions amending Utah's Construction Trades Licensing Act, Utah Code Section 58-55-101, *et seq.* (Licensing Act). Put simply, the amendments make it unlawful for unincorporated entities holding Utah construction licenses or providing labor to others with such licenses, to have owners unlawfully present in the United States.

**A. S.B. 35 Sections 10 and 12, Amending Utah Code Sections 58-55-501 and 58-55-503**

Portions of S.B. 35 Sections 10 and 12 amended Utah Code Section 58-55-501(24), *Unlawful conduct*, and Section 58-55-503, *Penalty for unlawful conduct—Citations.* These Sections of the Licensing Act define unlawful conduct for construction license holders and set forth the penalties for engaging in such conduct. On their face, these provisions impose strict liability for the defined unlawful conduct.

S.B. 35 Section 10 amended Utah Code Section 58-55-501, *Unlawful conduct,* to add Subsections (24)(a) and (b), providing that "unlawful conduct" is now defined to include:

> (a) an unincorporated entity licensed under this chapter having an individual who owns an interest in the unincorporated entity engage in a construction trade in Utah while not lawfully present in the United States; or

> (b) an unincorporated entity providing labor to an entity licensed under this chapter by providing an individual who owns an interest in the unincorporated entity to engage in a construction trade in Utah while not lawfully present in the United States.

S.B. 35 Section 12 amended Utah Code Section 58-55-503*, Penalty for unlawful conduct—Citations*, to reflect that unincorporated entities engaged in immigration-related unlawful conduct are subject to civil and criminal penalties, but may also take advantage of a "safe harbor" if they are able to show verification of an owner's working status. Specifically, these subsections provide for:

- A finding that an entity violating that subsection or failing to comply with a citation issued after it is final is guilty of a class A misdemeanor. UTAH CODE ANN. § 58-55-503(1)(a)(i).

- Possible citations. DOPL may also "attempt to negotiate a stipulated settlement, or notify the [entity] to appear before an adjudicative proceeding conducted under Title 63G, Chapter 4, Administrative Procedures Act." *Id.* at § 58-55-503(4)(a).

- A fine assessed to an entity in violation of the subsection "as evidenced by an uncontested citation," and "in addition to or in lieu of [the fine]," a cease and desist order. *Id.* at § 58-55-503(4)(a)(i).

- In addition to any other penalty, DOPL "shall" revoke the license of an entity violating the subsection "two or more times within a 12-month period, unless. . . the licensee can demonstrate that the licensee successfully verified the federal legal working status of the individual who was the subject of the violation using a status verification system, as defined in § 13-47-102." *Id.* at § 58-55-503(4)(j).

The final subsection provides a safe harbor to entities who check an owner's status using an acceptable "status verification system." Utah Code Section 13-47-102(4)(a) defines "status verification system" as an "electronic system operated by the federal government, through which an employer may inquire to verify the federal legal working status of an individual who is a newly hired employee." Utah Code Section 13-47-102(4)(b) identifies the following acceptable status verification systems, including the federal government's E-Verify system:

> (i) the electronic verification of the work authorization program of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 8 U.S.C. Sec. 1324a [E-Verify];
>
> (ii) a federal program equivalent to the program described in Subsection (4)(b)(i) that is designated by the United States Department of Homeland Security or other federal agency authorized to verify the employment eligibility status of a newly hired employee pursuant to the Immigration Reform and Control Act of 1986;
>
> (iii) the Social Security Number Verification Service or similar online verification process implemented by the United States Social Security Administration; or
>
> (iv) an independent third-party system with an equal or higher degree of reliability as the programs, systems, or processes described in Subsection (4)(b)(i), (ii), or

(iii).[1]

**B. S.B. 35 Section 11, amending Utah Code Section 58-55-502**

Section 11 of S.B. 35 amended Utah Code Section 58-55-502(8), *Unprofessional conduct*. That Section's definition of "unprofessional conduct" by a construction licensee now includes:

> (8) an unincorporated entity licensed under this chapter having an individual who owns an interest in the unincorporated entity engage in a construction trade in Utah while not lawfully present in the United States;

Subsection 502(8) (unprofessional conduct) is identical to Subsection 501(24)(a) (unlawful conduct), except that it does not give rise to criminal sanctions. An unincorporated entity found to have engaged in unprofessional conduct "as described in Section 58-55-502" is subject to public reprimand and having their license revoked, suspended, restricted, placed on probation, or

---

[1] A prior version of the statute referred to status verification systems "as defined in Section 13-47-201." That Section has been contingently repealed. In any event, both Section 13-47-201 and Section 13-47-102 include the federal government's E-Verify system as an acceptable status verification system. The repealed Section 13-47-201, *Verification required for new hires*, provided:

> A private employer who employs 15 or more employees as of July 1, 2010, may not hire a new employee on or after July 1, 2010, unless the private employer:
>
> (a) is registered with a status verification system to verify the federal legal working status of any new employee; and
> (b) uses the status verification system to verify the federal legal working status of the new employee in accordance with the requirements of the status verification system.

not renewed.  UTAH CODE ANN. § 58-55-401(2), *Grounds for denial of license and disciplinary proceedings.*[2]

### III.    Plaintiff's Citations

In June 2012, Defendant DOPL issued to Plaintiff six citations alleging violations of Utah Code Section 58-55-501(24)(a) because six of Plaintiff's member-owners were not lawfully present in the United States.  Atkinson Aff. at ¶ 30.  There were no citations issued under Utah Code Section 58-55-501(24)(b).

Plaintiff had in its possession completed Forms I-9 and copies of supporting documents for each of the six member-owners at issue.  *Id.* at ¶ 34.  Plaintiff defended itself at a subsequent administrative hearing conducted by DOPL, arguing that it had complied with federal laws and that it had no knowledge that the six member-owners were in the United States illegally.  *Id.* at ¶¶ 33-34.  The DOPL hearing's presiding officer concluded that although Plaintiff had "complied with I-9" (Dkt. 44 at 82), it nonetheless violated the state law because the six member-owners were not lawfully in the United States.  *Id.* and Atkinson Aff. at ¶ 35.  Plaintiff received a reduced fine of $250 for each of the six violations, and was issued a cease and desist order to prevent future unlawful conduct.  *Id.* at ¶ 37.  Plaintiff appealed these citations.  *Id.* at ¶ 38.  The Department of Commerce upheld on appeal the fines and the order.  That appeal is stayed pending resolution of this suit.  *Id.*

---

[2] Plaintiff claims S.B. 35's immigration-related provisions were enacted with the purpose of putting Plaintiff out of business, as the provisions apply to any "unincorporated entity" holding a state-issued contractor's license. (Dkt. 43 at 23.)  Plaintiff claims it is the only such entity in the State of Utah.  *Id.* at 24.  Defendants do not dispute that Plaintiff is the only such entity.  But Plaintiff's argument is not grounded in any legal citation and is not sufficiently developed for the court to understand or address.  Notably, Plaintiff advances no special legislation arguments.

## DISCUSSION

Plaintiff seeks summary judgment on its claim that the Licensing Act amendments are preempted by federal immigration law provisions in IRCA.  The preemption analysis requires the court to evaluate Utah's Licensing Act amendments in light of IRCA.  But before reaching the merits of Plaintiff's preemption arguments, the court first addresses Plaintiff's standing to assert its claim.

### I.        Standing

Article III of the United States Constitution restricts the jurisdiction of this court to the adjudication of "Cases" or "Controversies."  U.S. Const. art. III, § 2, cl. 1; *Bronson v. Swensen,* 500 F.3d 1099, 1106 (10th Cir. 2007).  To proceed here, Plaintiff must establish that a case or controversy exists and that it has standing to sue by showing that three elements are satisfied. *Bronson,* 500 F.3d at 1106.  First, Plaintiff "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted).  Second, Plaintiff must show "a causal connection between the injury and the conduct complained of"—meaning that the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Id.* (citations omitted).  Third, "it must be likely, as opposed to merely speculative," that Plaintiff's alleged injury "will be redressed by a favorable decision."  *Id.* at 561 (citations omitted).

The parties in their briefing agree that Plaintiff satisfies these three elements.  The court nevertheless has an independent obligation to ensure this is correct.  *Citizens Concerned for Separation of Church & State v. City & Cnty. of Denver*, 628 F.2d 1289, 1296 (10th Cir. 1980) (parties may not "by stipulation" invoke a court's jurisdiction "in litigation which does not

present an actual case or controversy") (citations omitted).  The court concludes that Plaintiff has standing to challenge the Licensing Act amendments here at issue.

Plaintiff has suffered an injury in fact traceable to the actions of the Defendants.  Plaintiff received six citations from Defendant DOPL and has been ordered to pay related fines under Utah Code Section 58-55-501(24)(a), one of the amended immigration-related provisions of the Licensing Act.[3]  Plaintiff was also issued a "cease and desist" order prohibiting it from engaging in "unlawful conduct."  It has appealed those fines pending the resolution of this case.  Thus far, Defendant Department of Commerce has affirmed the fines and the order.  A favorable decision from this court granting summary judgment and declaring the Licensing Act amendments preempted would remove the bases for Plaintiff's citations and redress Plaintiff's alleged injury.

The court thus concludes that Plaintiff has established standing to challenge the amendments to the Licensing Act.  Having determined this, the court turns to the merits of Plaintiff's Motion for Summary Judgment.  The court begins with the legal standards guiding its analysis of Plaintiff's Motion.

## II.   Applicable Standards

### A.  Summary Judgment

Plaintiff seeks summary judgment on its claim that the Licensing Act amendments are preempted by IRCA.  Under Rule 56(a), Federal Rules of Civil Procedure, the court may grant Plaintiff's Motion for Summary Judgment only if Plaintiff meets its burden to show that there is no genuine dispute as to any material fact and that Plaintiff is entitled to judgment as a matter of law.  In conducting this analysis, the court views the facts and evidence in the light most

---

[3] As previously noted, Subsection 501-(24)(a) reaches the same conduct as Subsection 502(8) but violations of Subsection 24(a) give rise to criminal sanctions.

favorable to the Defendants opposing summary judgment.  *Morris v. City of Colorado Springs,* 666 F.3d 654, 660 (10th Cir. 2012) (citations omitted).

### B.  Preemption Principles

The Supremacy Clause provides that "federal law 'shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'"  *Arizona v. United States*, 132 S.Ct. 2492, 2500 (2012) (quoting Art. VI, § 1, cl. 2).  This principle allows Congress to preempt state laws that are contrary to federal laws.  *Id.* (citations omitted).

Preemption may occur expressly through the enactment of a federal law containing a preemption provision.  *Id.* at 2500-01.  "When a federal law contains an express preemption clause, [courts] focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive intent."  *Chamber of Commerce of the United States v. Whiting*, 131 S.Ct. 1968, 1977 (2011) (citations omitted).

Preemption may also occur impliedly in two ways.  First, Congress may intend that it alone will regulate a particular field.  *Arizona v. United States,* 132 S.Ct. at 2501 (citations omitted).  This "field preemption" occurs when an "intent to displace state law altogether can be inferred from a framework of regulation so pervasive that Congress left no room for States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."  *Id.* (citations omitted).

Second, "state laws are preempted when they conflict with federal law."  *Arizona v. United States,* 132 S.Ct. at 2501 (citations omitted).  This "conflict preemption" can include both instances where "compliance with both federal and state regulations is a physical impossibility,"

and those where the "state law stands as an obstacle to the accomplishment and execution of the

full purpose and objectives of Congress."  *Id.* (citations omitted).

A court conducting a conflict preemption analysis exercises its "judgment to determine

what constitutes an unconstitutional impediment to federal law, and that judgment is informed by

examining the federal statute as a whole and identifying its purpose and intended effects."

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).  But this analysis must begin

with the assumption that "the historic police powers of the States are not superseded unless that

was the clear and manifest purpose of Congress."  *Arizona v. United States*, 132 S.Ct. at 2501

(citations omitted).  A "freewheeling judicial inquiry" here is not justified because it is

"Congress rather than the courts that preempts state law."  *Whiting*, 131 S.Ct. at 1985 (citations

omitted).  Thus, a "high threshold must be met if a state law is to be preempted for conflicting

with the purposes of a federal act."  *Id.* (citations omitted).  The state law in question must "be a

material impediment to the federal action or thwart the federal policy in a material way."  *Mount

Olivet Cemetery Ass'n v. Salt Lake City,* 164 F.3d 480, 489 (10th Cir. 1998) (citations omitted).

### C.  Background on Federal Immigration Law

In the area of immigration and the status of aliens, the United States government has

"broad, undoubted power."  *Id.* at 2498 (citations omitted).  This power is rooted in part in the

federal government's need to establish uniform rules of naturalization and its role as the

sovereign conducting the nation's foreign relations.  *Id.* (citations omitted).  Exercising this

broad power, Congress in 1952 enacted the Immigration and Nationality Act (INA), 8 U.S.C. §

1101, *et seq.,* to establish a "comprehensive federal statutory scheme for regulation of

immigration and naturalization" and to specify "the terms and conditions of admission to the

country and the subsequent treatment of aliens lawfully in the country." *Whiting*, 131 S.Ct. at

1973 (citing *DeCanas v. Bica*, 424 U.S. 351, 353 (1976)).

Over three decades later, Congress in 1986 enacted the Immigration Reform and Control

Act (IRCA) as a "comprehensive framework for 'combating the employment of illegal aliens.'"

*Arizona v. United States,* 132 S.Ct. at 2504; Pub. L. 99-603.  The law imposes civil and criminal

sanctions, including fines, criminal prosecution and imprisonment upon employers who violate

its provisions.  It does not impose sanctions "on the employee side (*i.e.*, penalties on aliens who

seek or engage in unauthorized work)." *Arizona v. United States,* 132 S.Ct. at 2504.

First, IRCA makes it unlawful for a person or entity "to hire, recruit[4] or refer for a fee,[5]

for employment in the United States an alien knowing the alien is an unauthorized alien with

respect to such employment . . . ." 8 U.S.C. § 1324a(a)(1)(A).[6]  As a means of complying with

this overarching provision, employers are allowed (but not required) to use the federal

---

[4]  "Recruit for a fee" means "the act of soliciting a person, directly or indirectly, and referring that person to another with the intent of obtaining employment for that person, for remuneration whether on a retainer or contingency basis . . . ." 8 C.F.R. § 274a.1(e).

[5] "Refer for a fee" means "sending or directing a person or transmitting documentation or information to another, directly or indirectly, with the intent of obtaining employment in the United States for such person, for remuneration . . . ." 8 C.F.R. § 274a.1(d).

[6] "Employee" means "an individual who provides services or labor for an employer for wages or other remuneration but does not mean independent contractors . . . or those engaged in casual domestic employment . . . ." 8 C.F.R. § 274a.1(f).  "Employer" means "a person or entity . . . who engages the services or labor of an employee to be performed in the United States for wages or other remuneration." *Id.* at § 274a.1(g).  "Employment" means "any service or labor performed <u>by an employee for an employer</u> within the United States . . . ." *Id.* at § 274a.1(g) (emphasis added).  Section 1324a(4) provides that one is considered to have hired the alien for employment in the United States if the person or entity "uses a contract . . . to obtain the labor of an alien in the United States knowing that the alien is an unauthorized alien . . . ."

government's "E-Verify" electronic eligibility verification system[7] to check an employee's authorization to work.  An employer who uses "E-Verify" and obtains "confirmation of identity and employment eligibility" establishes a rebuttable presumption that it has not violated IRCA's prohibition on hiring unauthorized aliens.

Second, IRCA requires some categories of employers to whom it generally applies to comply with "Form I-9 requirements" by requesting and reviewing documents establishing an employee's eligibility for employment.  These categories of employers are those who: 1) "hire for employment" or 2) "hire, recruit or refer for a fee, for employment" in an agricultural business.  These employers must review passports, resident alien cards, or other documents approved by the Attorney General; or a combination of other documents such as driver's licenses and social security cards.  *Id.* at § 1324a(b)(1)(B)-(D).  They must then attest on a Form I-9 to having reviewed such documentation and "verif[ying] that the individual is not an unauthorized alien."  *Id.* at § 1324a(b)(1)(A).

Third, IRCA bars employers from engaging in unfair immigration-related employment practices, such as discriminating on the basis of national origin or lawful alien status.  *Id.* at § 1324b(a)(1).  But an employer who complies "in good faith with the [Form I-9 document review requirements] has established an affirmative defense" to charges of § 1324a(a)(1)(A) violations.  *Id.* at § 1324a(a)(3).

---

[7] E-Verify is an Internet-based system that allows an employer to verify an employee's work-authorization status.  *Whiting*, 131 S.Ct. at 1975 (citations omitted).  An employer submits via E-Verify a request with information provided by the employee.  The employer later receives a response either confirming or tentatively non-confirming an employee's authorization to work.  *Id.*  An employee may challenge a tentative non-confirming report.  If an employee fails to challenge such a report or does so unsuccessfully, her employment may end and the federal government must be informed.  *Id.*

Critical to the issues in this case, IRCA includes a provision stating that it preempts "any State or local law imposing civil or criminal sanctions (other than through licensing or similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens." *Id.* at § 1324a(h)(2); *see also Whiting*, 131 S.Ct. at 1973 (noting Congress' express preemption). The parenthetical exception to IRCA's preemption provision for "licensing or similar laws" is sometimes referred to as IRCA's "savings clause."

Plaintiff argues that IRCA and the Supreme Court's decision in *Chamber of Commerce of the United States v. Whiting* govern the outcome in this case. The court observes that in contrast to the Utah Licensing Act amendments at issue here, the Arizona law in *Whiting* directly governed the employer-employee relationship. Still, an examination of the *Whiting* decision is helpful to address Plaintiff's arguments.

In *Whiting,* the Supreme Court considered whether federal immigration law preempted an Arizona law concerning the employment of unauthorized aliens. The Arizona law: 1) allowed state courts "to suspend or revoke the licenses necessary to do business in the State if an employer knowingly or intentionally employs an unauthorized alien"; and 2) required every employer to verify the employment eligibility of every employee by using "E-Verify." 131 S.Ct. at 1976-77 (citing ARIZ. REV. STAT. ANN. §§ 23-211, 212, 212.01, and 23-214(A)) (other citations omitted). An employer's use of E-Verify created a rebuttable presumption that the employer did not knowingly employ an unauthorized alien, and good faith compliance with the Form I-9 process was a defense to a charge under the statute. *Id.* (citing ARIZ. REV. STAT. ANN. § 23-212).

The *Whiting* Plaintiffs argued that federal immigration law 1) expressly and impliedly preempted Arizona's law allowing for the revocation of business licenses for employers who

hired unauthorized aliens, and 2) that the provision mandating employers to use E-Verify was impliedly preempted.  The Supreme Court disagreed.

The Court first held that Arizona's business license revocation provision was not expressly preempted by IRCA.  Evaluating the plain language of IRCA's preemption provision, the Court explained that IRCA "expressly preempts the States from imposing 'civil or criminal sanctions' on those who employ unauthorized aliens, 'other than through licensing and similar laws.'"  *Whiting*, 131 S.Ct. at 1977 (quoting 8 U.S.C. § 1324a(h)(2)).  The Arizona law on its face imposed sanctions through licensing laws.  Its definition of "license" included various state permits issued "for the purposes of operating a business in the State," as well as "articles of incorporation, certificates of partnership, and grants of authority to foreign companies to transact business in the State."  *Id.* at 1978, n.5 (quoting Ariz. Rev. Stat. Ann. § 23-211(9)(a)).  Although broad in its application, the Court concluded that the law was plainly a "licensing" or at least a "similar" law falling "well within the confines of the authority Congress chose to leave to the States and therefore is not expressly preempted."  131 S.Ct. at 1981.[8]  Because the Arizona law fell within its savings clause, IRCA did not expressly preempt the license revocation provision.

A plurality of the Court also concluded that IRCA did not impermissibly conflict with, and thus impliedly preempt, the license revocation provision where Arizona had "simply implement[ed] the sanctions that Congress expressly allowed [it] to pursue through licensing

---

[8] The Court noted that even if the law's regulation of "articles of incorporation, partnership certificates and the like is not itself a 'licensing law,' it is at the very least 'similar' to a licensing law, and therefore comfortably within the savings clause."  *Whiting*, 131 S.Ct. at 1978 (citations omitted).

laws." *Id.* at 1981.  Congress "specifically preserved such authority for the States" and could not

have intended "to prevent the States from using appropriate tools to exercise that authority." *Id.*[9]

The Court additionally noted that the harshness of the license revocation penalties

available under the Arizona law neither upset any "balance that Congress sought to strike when

enacting IRCA" nor created "interference with the federal program in this case . . . ." *Id.* at

1983.  "Regulating in-state businesses through licensing laws has never been considered . . . an

area of dominant federal concern." *Id.* at 1983.  While license suspension and revocation are

significant sanctions, "they are typical attributes of a licensing regime" and the immigration-

related provision were not the only Arizona licensing laws providing for such sanctions. *Id.* at

1983-84.  The Court rejected the notion that IRCA precluded states from imposing harsh

sanctions.  IRCA preserved state authority not over "only small sanctions," but over an entire

"category of sanctions—those imposed through 'licensing and similar laws.'" *Id.* at 1984.

The Court likewise concluded that Arizona's requirement that employers use E-Verify

was not impliedly preempted as conflicting with the federal law.  The federal law at issue

provides that the federal government cannot require non-federal employers to use E-Verify.  But

Arizona's law did not involve the federal government mandating use of E-Verify. *Id.* at 1985.  It

thus did not conflict.  The Court further noted that the consequences under both the federal and

---

[9] A plurality of the Court further noted that Arizona had gone "the extra mile" to ensure its
enforcement used  "appropriate tools" by "closely tracking the IRCA" in: 1) adopting the federal
government's definition of "unauthorized alien;" 2) barring, like the federal law, "knowingly"
employing an unauthorized alien and defining that phrase with reference to federal law; and 3)
providing affirmative defenses based on good faith compliance with Form I-9 procedures and
rebuttable presumptions of compliance with the laws by using E-Verify—like the federal
immigration laws. *Id.* at 1982-83 (citations omitted).

state laws of not using E-Verify were the same—the loss of the rebuttable presumption of compliance with the laws. *Id.* at 1985-86.[10]

With that background in mind, the court turns to Plaintiff's arguments in favor of summary judgment.

### III.    Plaintiff's Motion for Summary Judgment

Plaintiff argues in its briefing that: 1) the criminal sanctions in the Licensing Act amendments are both expressly and field preempted by IRCA; and 2) the Licensing Act amendments "directly and irreconcilably" conflict with and are therefore impliedly preempted by IRCA.  Defendants respond in their briefing that: 1) Plaintiff has not shown it is regulated by IRCA at all; and 2) even if it were governed by IRCA, the Licensing Act amendments are simply "licensing laws" expressly excepted from IRCA preemption under the federal statute's savings clause.  Defendants' argument on conflict preemption is fleeting.  Defendants argue that IRCA concerns employer-employee relations while the Licensing Act amendments are licensing laws directed toward terms and conditions of ownership of unincorporated entities.

For the reasons that follow, the court concludes the Licensing Act amendments are not preempted by IRCA.

### A.  Express Preemption

The court must first determine if IRCA expressly preempts the Licensing Act amendments.  IRCA makes it unlawful to "hire, or to recruit or refer for a fee," aliens unauthorized for employment in the United States.  8 U.S.C. § 1324(a)(1)(A).  It further

---

[10] A plurality also concluded that Arizona's mandated use of E-Verify did not conflict with the federal government's goals in developing E-Verify—to "ensure reliability in employment authorization verification, combat counterfeiting of identify documents, and protect employee privacy."  *Whiting*, 131 S.Ct. at 1986 (quoting 8 U.S.C. § 1324a(d)(2)).  The federal government has for some time been encouraging increased use of the system and disputes criticisms of its reliability.  *Id.*

expressly preempts "any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens."  8 U.S.C. § 1324a(h)(2).

In light of these provisions, the court must evaluate whether Utah's Licensing Act amendments initially fall within IRCA's preemption provision as laws "imposing civil or criminal sanctions . . . upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens."  If so, the court must then determine whether the savings clause in the preemption provision applies to the Licensing Act amendments.

As explained in greater detail above, the amended Licensing Act penalizes unincorporated entities under two circumstances.  First, Subsections 501(24)(a) and 502(8) subject unincorporated entities with construction licenses to possible penalties if their owners are engaged in a construction trade in Utah while not lawfully present in the United States.  These Subsections define this conduct as both "unlawful" and "unprofessional."  UTAH CODE ANN. §§ 58-55-501(24)(a) and -502(8).  These Subsections are unrelated to employing, recruiting, or referring for a fee unauthorized aliens.  Rather, they concern whether entities licensed by the State of Utah and engaged in the construction trade are owned by persons lawfully present in the United States.  They are not expressly preempted by IRCA.

But another Subsection of the amended Licensing Act defines "unlawful conduct" to include instances when an unincorporated entity "provid[es] labor to an entity licensed under this chapter by providing an individual who owns an interest in the unincorporated entity to engage in a construction trade in Utah while not lawfully present in the United States."  UTAH CODE ANN. § 58-55-501(24)(b).  This Subsection addresses the provision of (presumably paid) labor to another, not simply the terms and conditions of an unincorporated entity's ownership.  For this

reason, it may—at least in some circumstances—fall within IRCA's general preemption of state laws imposing sanctions on those who "refer for a fee for employment, unauthorized aliens." Under IRCA, "refer for a fee" means "sending or directing a person or transmitting documentation or information to another, directly or indirectly, with the intent of obtaining employment in the United States for such person, for remuneration . . . ." 8 C.F.R. § 274a.1(d). An unincorporated entity likely would act within the ambit of both Utah Code Subsection 501(24)(b) and IRCA's express preemption provision if it provided labor (as broadly defined in IRCA) to another in a construction trade in Utah for remuneration.[11]

But even if Subsection 501(24)(b) is initially preempted by IRCA, the court must still evaluate whether it is a "licensing or similar law[]" within the preemption provision's savings clause. The court concludes that it is.[12]

The Licensing Act amendments, including Subsection 501(24)(b), "on their face, purport[] to impose sanctions through licensing laws." *Whiting,* 131 S.Ct. at 1977. The amendments are all directed to and contained in Utah's Construction Trades Licensing Act. They define unprofessional and unlawful conduct for those the State of Utah has licensed in the construction trade. Penalties for engaging in the proscribed unprofessional or unlawful conduct are included in the same statutes as the penalties for other types of construction-related unlawful

---

[11] The court's analysis in this section is focused express preemption, and therefore only on a comparison of the statutory language of IRCA and the Utah Construction Trades Licensing Act. The court does not evaluate here whether Plaintiff has established with competent evidence that it actually receives payment in exchange for providing those in the construction trade in Utah with information about its members with the intent that they will obtain employment. That analysis is set forth below in the court's discussion of conflict preemption.

[12] Indeed, even if Subsections 501(24)(a) and 502(8) initially fell within IRCA's express preemption provision, the court concludes that those Subsections would likewise fall within the savings clause for the same reasons Subsection 501(24)(b) does.

and unprofessional conduct, including citations, fines, refusal to renew a license, reprimands, cease and desist orders, license revocation, and possible misdemeanor criminal charges. *See* UTAH CODE. ANN. §§ 58-55-503 and 58-55-401. Thus, assuming at least some portion of Subsection 501(24)(b) falls within IRCA's ambit, it also falls within the savings clause to IRCA's preemption provision—"well within the confines of the authority Congress chose to leave to the States." *Id.* at 1981.

Plaintiff agrees in its briefing and conceded at oral argument that under *Whiting*, most of the Licensing Act amendments are "licensing laws" within IRCA's savings clause, and thus not expressly preempted. (Dkt. 43 at 31.) But Plaintiff argues that the criminal penalty that may be triggered for violations of Subsections 24(a) and (b) in amended Utah Code Section 58-55-503(1)(a)(i) renders these laws "criminal statutes" rather than "licensing laws" because any misdemeanor charges "must be prosecuted in Utah district courts." (Dkt. 43 at 30-31.) Plaintiff's argument is unpersuasive.

IRCA expressly preempts "any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ . . . unauthorized aliens." The plain language of this provision indicates that states may impose criminal or civil sanctions for employing unauthorized aliens "through licensing and similar laws." The express preemption determination hinges on the categorical nature of the state law and not the penalty imposed for violations. The language employed by Congress compels the conclusion that criminal sanctions were anticipated among possibly penalties state might impose through their licensing laws.

And it is not a new development in the Licensing Act to impose criminal sanctions for licensing-related violations. Even before passage of S.B. 35, Section 58-55-503 made it a Class

A misdemeanor for a construction trade licensee to engage in "unlawful conduct" as it was then defined, or to fail to comply with a citation issued after it became final.  S.B. 35 simply broadened the definition of that "unlawful conduct" to include the immigration-related conduct set forth in Subsections 501(24)(a) and (b).

It cannot be that imposing severe sanctions or having a Utah court involved in the penalty process renders the amended Licensing Act something other than a "licensing or similar law."  8 U.S.C. § 1324a(h)(2).  Notably, severe sanctions (in the form of license revocation) and judicial review were both present in the *Whiting* case.  The Court nevertheless concluded that the license revocation law at issue there clearly fell within IRCA's saving clause as either a "licensing or similar law."  The criminal penalty set forth in Section 58-55-503 likewise does not alter the fact that the amended Licensing Act is a licensing or similar law within the saving clause in IRCA's preemption provision.

The court concludes based upon the foregoing that IRCA does not expressly preempt the amended provisions of the Licensing Act.  The court next turns to Plaintiff's argument that IRCA impliedly preempts the Licensing Act amendments.

## B.  Implied Preemption

Plaintiff also argues that the immigration-related amendments to the Licensing Act are impliedly preempted.  Implied preemption may occur through field preemption or conflict preemption.  The court evaluates each category in turn.

### 1.  Field Preemption

Plaintiff briefly suggests in its Motion that Congress has preempted the field of "criminal prosecution related to employment of unauthorized aliens," reserving this authority "solely to the federal government."  (Dkt. 43 at 26.)  Plaintiff conceded at oral argument, however, that field preemption is inapplicable to Utah's licensing laws at issue in this case, including the challenged

criminal sanction.  The court agrees.  An "intent to displace state law altogether can be inferred from a framework of regulation so pervasive that Congress left no room for States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject."  *Arizona v. United States,* 132 S.Ct. at 2501 (citations omitted).  The savings clause in IRCA's preemption provision indicates that Congress intended to preserve for the states the ability to impose civil or criminal sanctions relating to the employment of unauthorized aliens so long as the sanctions are imposed through "licensing or similar laws."  Further, as a plurality of the *Whiting* Court noted, in enacting IRCA, Congress "allocate[d] authority between the Federal Government and the States," and in so doing "preserved state authority over a particular category of sanctions—those imposed 'through licensing and similar laws.'"  131 S.Ct. at 1984.  The court concludes there is no field preemption.

### 2.  Conflict Preemption

Plaintiff nevertheless maintains that IRCA impliedly preempts the Licensing Act amendments because the laws conflict.  Plaintiff contends it is subject to both laws, that compliance with both laws is impossible, and that the Licensing Act amendments create impermissible obstacles to the accomplishment of Congress's full purposes and objectives in enacting IRCA.  As discussed below, the court finds these arguments unpersuasive.

At the outset, the court notes that its determinations that Subsections 501(24)(a) and 502(8) are not expressly preempted by IRCA, and that those Subsections and Subsection 501(24)(b) fall within that law's savings clause, do not foreclose Plaintiff's argument that these Subsections are nonetheless impliedly conflict preempted.  *Arizona v. United States*, 132 S.Ct. at 2504-05 ("the existence of an 'express pre-emption provision does not bar the ordinary working

of conflict pre-emption principles' or impose a 'special burden' that would make it more difficult to establish the preemption of laws falling outside the clause") (quoting *Geier v. American Honda Motor Co., Inc.,* 529 U.S. 861, 869 (2000) (savings clause did not bar "ordinary working of conflict pre-emption principles" regarding state law tort claims) (citations omitted)).  A plurality of the *Whiting* Court conducted a conflict preemption analysis of the Arizona license revocation law at issue in that case after concluding it fell within IRCA's express savings clause. 131 S.Ct. at 1981-85.  The plurality noted that the state law at issue "simply implement[ed] the sanctions that Congress expressly allowed Arizona to pursue through licensing laws.  Given that Congress specifically preserved such authority for the States, it stands to reason that Congress did not intend to prevent the States from using appropriate tools to exercise that authority."  *Id.* at 1981.[13]

The court therefore evaluates whether the amendments to the Licensing Act impermissibly conflict with IRCA and are thus preempted because they render compliance with IRCA impossible or because they materially impede IRCA's purposes.

**a.  Impossibility**

Plaintiff argues both IRCA and Utah's Licensing Act amendments apply to its business structure but that its compliance with both the federal and state legislative schemes is impossible.

---

[13]  The court views it as sensible to proceed with caution when conducting a conflict preemption analysis in light of IRCA's express savings clause reserving to states the ability to sanction through licensing or similar laws those who employ unauthorized aliens and the fact that "[r]egulating in-state businesses through licensing laws has never been considered . . . an area of dominant federal concern."  *Whiting,* 131 S.Ct. at 1983 (plurality opinion).  But the *Arizona*, *Geier*, and *Whiting* decisions do not instruct this court to apply a more stringent burden on the Plaintiff to establish conflict preemption even under these circumstances, and the court will not impose a heightened burden.  Still, the *Whiting* plurality's discussion of IRCA's savings clause and traditional state governance of in-state businesses and licensing is relevant to the court's analysis of the intended scope and purposes of IRCA.

At oral argument, Plaintiff seemed to hinge its conflict preemption argument on this point, claiming that federal law makes it unlawful and thus impossible for unincorporated entities like the Plaintiff—with owners whose immigration status must be verified—to use the federal E-Verify system to ascertain whether owners are lawfully present in the United States.  In contrast, Utah's Licensing Act amendments anticipate the use of E-Verify as a critical tool for ensuring compliance with the Licensing Act's provisions, and further provide safe harbor from severe penalties for "unlawful conduct" if an entity shows it has used a status verification system like E-Verify.

Plaintiff claims it cannot use E-Verify, and thus can neither comply with the Licensing Act nor take advantage of the safe harbor provision for two reasons: 1) unidentified Homeland Security officials have informed Plaintiff that it is prohibited from directly using E-Verify to check the status of member-owners because they are not Plaintiff's employees; and 2) IRCA-governed entities which are also required to complete Forms I-9 cannot avoid this prohibition on using E-Verify by requiring member-owners to "self-check" their status because IRCA bars the entities from demanding documents from employees beyond those specifically identified in IRCA, and any entity imposing such a requirement risks unfair employment practice claims.

The court concludes that neither of Plaintiff's proffered reasons prevent it from utilizing E-Verify.  Plaintiff has thus failed to show an impossible conflict in complying with federal law and Utah's Licensing Act.

1.  **Plaintiff has Not Shown that Homeland Security Officials Barred it from Using E-Verify or Requiring Member-Owners to Self-Check**

Plaintiff first argues that it cannot use E-Verify because the federal government bars Plaintiff from using that system directly to check the status of member-owners.  Plaintiff supports this argument by stating that an official from the United States Department of

Homeland Security "has told [its] management that [it] may not check its members' names with E-Verify because those members are not employees of the company." (Dkt. 43 at 41-42, 11-12.)

But Plaintiff has offered the court no authority to support the contention that hearsay from an unnamed government official alone establishes that the federal government has prohibited entities using Plaintiff's business model to check the status of its member-owners with E-Verify. The court declines to entertain the notion of striking down a state law on this basis. But even if entities like Plaintiff's cannot use E-Verify to ascertain the status of member-owners, this does not render it impossible to comply with both federal law and the Licensing Act amendments.

As Defendants suggested in their briefing and at oral argument, unincorporated entities using Plaintiff's business model may require prospective member-owners to self-check their employment status using E-Verify and provide results to the entity as a condition of ownership. Plaintiff already requires potential member-owners to sign written agreements stating that membership is conditioned on the signer being a U.S. citizen, permanent resident, or otherwise authorized to lawfully work in the U.S. and be paid for such work under the Immigration and Naturalization Act, U.S.C. § 1101, *et seq.* Entities in Plaintiff's position could further require those it brings on as prospective member-owners to provide proof of an E-Verify self-check as an additional condition of membership and ownership in the entity, and thereby avoid using E-Verify in a way Plaintiff claims is impermissible.

Plaintiff nevertheless insists that unincorporated entities like it cannot require potential owners to provide evidence of an E-Verify self-check. Plaintiff argues that IRCA applies to its relationship with its member-owners and requires it to complete Forms I-9 for its member-

owners, but bars it from requiring documents different from or in addition to those listed in the statute or risk being accused of engaging in an unfair employment practice:

> (6) Treatment of certain documentary practices as employment practices
>
> A person's or other entity's request, for purposes of satisfying the requirements of section 1324a(b) of this title [concerning Forms I-9], for more or different documents than are required under such section or refusing to honor documents tendered that on their face reasonably appear to be genuine shall be treated as an unfair immigration-related employment practice if made for the purpose or with the intent of discriminating against an individual in violation of paragraph (1).

8 U.S.C. § 1324b(6). This argument is unpersuasive. As the court discusses below, IRCA may apply to Plaintiff in some instances, but Plaintiff has neither shown that IRCA applies specifically to its relationship with its member-owners nor that it requires Plaintiff to complete Forms I-9 with regard to its prospective member-owners at all. Thus, IRCA's provisions relating to unfair employment practices cannot operate to create an impossible conflict for Plaintiff in complying with both IRCA and the Licensing Act amendments.

## 2. Plaintiff has Not Shown that IRCA Applies to its Relationship with its Member-Owners

The court begins its analysis of whether the Licensing Act amendments impossibly conflict with IRCA's unfair employment practice provisions by evaluating whether both IRCA and the Licensing Act amendments may apply to regulate the same entity—one like the Plaintiff. If these laws do not apply to regulate the same entity, then there can be no conflict rendering it impossible for an entity to comply with both.

The court concludes IRCA and the Licensing Act may apply in some instances to regulate the same entity. The Licensing Act amendments apply to unincorporated entities with owners either licensed by the State of Utah to engage in the construction trade or providing an owner to engage in construction labor to an entity so licensed. UTAH CODE ANN. §§ 58-55-

501(24)(a), (b) and 58-55-502(8).  IRCA applies to those who "hire, recruit or refer for a fee" persons for employment in the United States.  8 U.S.C. § 1324a(a)(1)(A).  There is no IRCA exception for unincorporated entities.  A Utah-based unincorporated entity with owners and a construction license, or one which provides its owners as labor for others with a construction license plainly might hire an employee or recruit or refer for a fee persons to do work.  The Licensing Act and IRCA could both apply to govern the same entity.

And, in fact, Plaintiff must comply with both the Licensing Act amendments and IRCA. It is undisputed that Plaintiff is an unincorporated Utah entity holding a construction license which has hundreds of owners.  It is thus governed by the Licensing Act amendments.  It is further undisputed that Plaintiff has at least one W-2 employee, Ren Bell.  Plaintiff's employment of Mr. Bell is subject to IRCA.  Accordingly, Plaintiff is subject to IRCA's requirements—at least in some instances.

But the critical next step in the analysis is whether it is impossible for Plaintiff to comply with both laws.  The challenge Plaintiff identifies in complying with both laws does not concern its relationship with its lone employee, Mr. Bell.  It concerns Plaintiff's relationship with its member-owners and compliance with both IRCA's Form I-9 and unfair employment practice provisions on the one hand, and on the other hand, the Licensing Act's verification requirements essentially mandating at least that member-owners self-check via E-Verify.

Both sides devote much of their briefing to addressing whether IRCA applies to govern Plaintiff's relationship with its member-owners—the relationship Utah's Licensing Act amendments target.  Defendants dispute that it does.  Plaintiff argues that although it admittedly "is not an employer of its members under Utah law—and under traditional employer-employee legal concepts," IRCA nevertheless governs its relationship with its member-owners because it is

"effectively treated as an 'employer' for purposes of verifying the employment eligibility of its members under IRCA." (Dkt. 43 at 38.) The court finds on the record before it, however, that Plaintiff has not established as a matter of law with competent evidence that its relationship with its member-owners falls under IRCA's ambit. Thus, Plaintiff faces no impossible conflict in complying with both laws.

The court first observes that Plaintiff offers no evidence that it has ever formally or officially been treated as an employer of its member-owners under IRCA. In fact, as discussed above, Plaintiff argues that it has been told by Homeland Security officials that it cannot use the federal government's E-Verify system to check the status of its member-owners because they are not Plaintiff's employees. If true, this suggests that at least some government officials do not view Plaintiff's member-owners as employees for purposes of application of IRCA.

Plaintiff unconvincingly contends that its treatment as an employer of its member-owners under IRCA is established under 8 U.S.C. § 1324a(4), *Unlawful employment of aliens—Use of labor through contract*:

> For purposes of this section, a person or other entity who uses a contract, subcontract, or exchange . . . to obtain the labor of an alien in the United States knowing that the alien is an unauthorized alien (as defined in subsection (h)(3) of this section) with respect to performing such labor, shall be considered to have hired the alien for employment in the United States in violation of paragraph (1)(A).

This provision brings within IRCA those who contract to obtain labor. Plaintiff argues that this provision applies to its relationship with its member-owners because "it enters into contracts with its members for the provision of construction services by its members." (Dkt. 48 at 6, 11.) As evidence of this, Plaintiff refers to the Operating Agreement its member-owners sign when they join Plaintiff's limited liability company.

There are two problems with Plaintiff's contention.  First, Plaintiff does not provide a copy of the Operating Agreement between it and its member-owners or explain with any specificity the terms of any contract with its members concerning the nature of construction services they will provide.  Second, the court concludes that Plaintiff has not established that it is contracting "to obtain" labor performed on Plaintiff's own behalf.  Rather, as its manager, Mr. Atkinson, explains, Plaintiff's member-owners are responsible for finding their own work and negotiating their own rate of pay.  At most, "through [its] members [Plaintiff] simply offers a contingent pool of independent tradesmen from which contractors who have successfully bid on such projects may draw to increase production on any given job as the need arises."  Second Atkinson Aff. at ¶ 6.

Plaintiff also argues that its relationship with its member-owners might fall under an IRCA provision making it unlawful for entities "to hire, or recruit or refer for a fee, for employment in the United States" one known to be an unauthorized alien.  *See* 8 U.S.C. § 1324a(a)(1)(A). (Dkt. 48 at 6-7.)  But Plaintiff admits it does not "hire" its member-owners "for employment" as a traditional employer might.  Plaintiff also directs the court to no competent evidence upon which it can conclude that Plaintiff actually either "recruits" or "refers" its member-owners for employment and receives a fee for doing so.[14]  The facts before the court are that Plaintiff provides administrative services, training and insurance to its member-owners.  It also maintains its member-owners in a pool of contingent labor from which others can hire.  Its

---

[14] Plaintiff attaches to its Reply Memorandum documents filed by the Department of Labor in a separate case brought against Plaintiff.  In its briefing, the Department of Labor argues that Plaintiff does collect a fee from companies who use Plaintiff's members for construction labor. (Dkt. 49 at Exhibit I, pp. 3-4; Exhibit J at 14.)  Plaintiff does not in its briefing adopt those arguments or provide to the court admissible evidence supporting those arguments.

member-owners, and not Plaintiff, determine which job to take, what hours to work, and what compensation they will receive.

Finally, Plaintiff emphasizes that it carefully completes Forms I-9 for all its member-owners.  IRCA requires completion of Forms I-9 from some categories of employers: 1) those who "hire for employment"; and 2) those who refer or recruit for fees—if they are also "an agricultural association, agricultural employer, or farm labor contractor."  8 U.S.C. § 1324a(1)(B); *U.S. Citizenship and Immigration Services Frequently Asked Questions: Who Needs to Complete Form I-9,* http://www.uscis.gov/faq-page/i-9-central-who-needs-complete-form-i-9#t17071n46932 (recruiters or referrers for fees generally do not have to fill out Forms I-9 on individuals who are recruited or referred unless involving agricultural work).  Plaintiff suggests that because it completes Forms I-9 for member-owners, its relationship with its member-owners is governed by IRCA.

But Plaintiff's decision to complete Forms I-9 for its member-owners does not mean this relationship actually falls within a category for which such documentation is required by IRCA. To the contrary, the court concludes that Plaintiff has failed to show that it is required by IRCA to complete Forms I-9 for member-owners.  First, Plaintiff does not "hire" its member-owners "for employment."  Second, as noted above, Plaintiff presented no evidence showing it is an entity referring labor for a fee.  Even if it had, there is no evidence or argument before the court that Plaintiff is an agricultural employer—the only recruiters or referrers required by IRCA to complete Forms I-9.

But even if Plaintiff were required to complete Forms I-9 for its would-be owners, in such instances they would not run afoul of IRCA by requiring proof of E-Verify self-checks, because they would not be requiring further documents for the purpose of satisfying Form I-9

requirements.  The further documents would instead be required to satisfy the Utah Licensing

Act amendments relating to ownership of an unincorporated entity.[15]

Thus, even if IRCA and the Licensing Act amendments apply to the same entity,

Plaintiff has failed to identify any conflict between the two laws which renders compliance with

both impossible.  The court concludes that the Licensing Act amendments are not subject to

conflict preemption on this basis.

### b.  Obstacle to IRCA's Purposes

Plaintiff finally argues that the Licensing Act amendments pose an impermissible

obstacle to the accomplishment of IRCA's purposes and are thus conflict preempted.  Plaintiff

here cites some of the differences between IRCA and the Licensing Act.  For instance, the

Licensing Act creates strict liability for immigration-related "unlawful" and "unprofessional"

conduct—including an unincorporated entity having an owner engaged in the construction trade

in Utah and not lawfully in the United States.  Plaintiff contends that this strict liability runs

afoul of IRCA's scheme because an unincorporated entity subject to the Licensing Act can fully

satisfy all Form I-9 requirements of IRCA but still be subject to severe penalties under the

amended Licensing Act.  (Dkt. 43 at 35-36.)

It may be true that an entity could comply with IRCA and still violate the Licensing Act

amendments—or any number of other Utah Licensing Act provisions.  Plaintiff fails to carry its

burden to establish how this shows that the Licensing Act amendments are "a material

impediment to [IRCA] or thwart the federal policy in a material way."  *Mount Olivet Cemetery*

---

[15] If requiring proof of an E-Verify self-check constitutes an unfair employment practice, it
seems that Plaintiff's requirement that its would-be owners sign an Operating Agreement further
attesting they are lawfully present in the United States might also amount to the same.

*Ass'n,* 164 F.3d at 489 (citations omitted).  On the record before it, the court can make no such finding.

In contrast to the Arizona law at issue in *Whiting*, Utah's Licensing Act amendments regulate a different sphere than IRCA.  The Licensing Act amendments require Utah unincorporated entities engaged in the construction trade to ensure those allowed to become company *owners* are lawfully in the United States, or face possible licensing sanctions.  IRCA penalizes *employers* who *hire* unauthorized aliens.  Plaintiff has not identified any policy of IRCA that is impeded by regulating who is allowed to become an owner of an entity licensed to engage in the construction trade in Utah.  There is no evidence before the court, for example, that Congress made a reasoned determination in enacting IRCA to refrain from requiring in-state entities to ensure that their owners are lawfully present in the United States.  *See Chamber of Commerce v. Edmonson,* 594 F.3d 742, 770 (10th Cir. 2010) (finding at preliminary injunction stage that Oklahoma law requiring employers to verify status of independent contractors likely was conflict preempted where Congress in enacting IRCA "intentionally excluded independent contractors  from verification obligations.")

For these reasons, the court concludes that Plaintiff has failed to show that the Licensing Act amendments stand as a material obstacle to IRCA's policies and are conflict preempted.

## CONCLUSION

Based upon the foregoing, the court concludes that federal law does not preempt the Licensing Act amendments enacted as a result of S.B. 35.  Plaintiff's Motion for Summary Judgment and Declaratory Relief on its preemption claim is DENIED.

Pursuant to Plaintiff's stipulations at oral argument on its Motion, Plaintiff's remaining claims are also DISMISSED.

The Clerk of Court is hereby directed to enter judgment in Defendants' favor on all of Plaintiff's claims and to close this case.

SO ORDERED this <u>17th</u> day of <u>November</u>, 2014.

BY THE COURT:

_____

Judge Robert J. Shelby
U.S. District Court